## INTERURBAN LAND CO. v. CRAWFORD.

(Circuit Court, N. D. Alabama, M. D. November 25, 1910.)

### No. 1.

1. LANDLORD AND TENANT (§ 30\*)—VALIDITY OF LEASE—STATUTORY LIMITATION OF TERM.

Code Ala. 1907, § 3418, which provides that no leasehold estate in lands can be created for a longer term than 20 years, applies only to such leasehold estates as must, by the terms of the lease, endure longer than 20 years, and does not render invalid a lease for a term which may or may not terminate within that time, depending on a future contingency, as one for the life of the lessor.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 86; Dec. Dig. § 30.\*]

2. LANDLORD AND TENANT (§ 63\*)—ESTOPPEL OF TENANT—SUIT FOR CONSTRUCTION OF LEASE.

The rule that a tenant cannot dispute the title of his landlord does not prevent a tenant, or those in privity with him, from maintaining a suit for the construction of his lease and a determination of his rights under it as against his landlord.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 159, 161, 162, 166, 176; Dec. Dig. § 63.\*]

3. LANDLORD AND TENANT (§ 44\*)—DEEDS (§ 5\*)—CONSTRUCTION OF CONTRACT—COVENANTS RUNNING WITH THE LAND.

Defendant was left, by the will of her husband, a life estate in certain lands valuable chiefly for farming purposes, but which were largely unimproved. She entered into a contract by which she granted, bargained, sold, and conveyed all her right, title, and interest in the lands in consideration of monthly payments to be made to her during her life. The contract further provided that, should the grantees lease or sell any part of the lands, or should minerals be developed thereon, they should pay defendant one-half the profits realized from such sales, leases, or minerals. It further provided that defendant should have the right to take wood from the lands during her life, that to secure the grantees against loss on improvements made in case of her death she should take out insurance on her life payable to them on which they were to pay the premiums and for a forfeiture with right of re-entry for their failure to pay any monthly installment or to pay half the profits on leases or sales or development of minerals. *Held* that, construing the contract as a whole and in the light of the situation of the parties, it was not intended as an absolute conveyance of all defendant's interest, but was rather in the nature of a lease, the covenants of which ran with the land and were binding on subsequent grantees not only as to the monthly payments, but also as to the share of the profits of sales, leases, or mineral development; such contemplated sales or leases being only of the lessees' interest.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 108–110; Dec. Dig. § 44;\* Deeds, Cent. Dig. §§ 7–9; Dec. Dig. § 5.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by the Interurban Land Company against Cora W. Crawford. Decree determining the respective interests of the parties in certain land.

Goodhue & Blackwood, for complainant.
Culli & Martin, for respondent.

GRUBB, District Judge. This cause is submitted for final decree upon the pleadings and evidence. The evidence, so far as deemed material, is contained in a stipulation and its exhibits filed in this cause. The bill was filed under the Alabama statute (Code 1907, § 5443 et seq.) providing for the determination of titles to and liens upon real estate. The bill calls upon respondent to set up her title to or interest in the lands described in it. · The answer responds by claiming a life estate, subject to a leasehold interest in the complainant. The common source of title was Ira Foster, the former husband of respondent, who devised the lands described in the bill, with others, to the respondent, his wife, for her life, with remainder to his children. The respondent, after the death of her husband, executed, with J. F. and J. H. Lovejoy, a contract transferring to them her life estate in these and other lands subject to certain conditions and reservations contained therein. Upon the proper construction of this contract depends the title to the lands in controversy. By intermediate transfers the interest in the lands conveyed by this contract passed to J. H. Lovejoy, who thereafter sold his interest to one Hassinger, complainant's transferror, for $1,000.

The contract, upon the construction of which the case is to be ·determined, was executed February 6, 1888, and modified December 22, 1888. It stipulated, among other things, that the respondent granted, bargained, sold, and conveyed all her right, title, and interest in and to a part of the lands so devised to her for life to J. F. and J. H. Lovejoy in consideration of a quarterly payment (made monthly and reduced in amount by the modification) during each year of her life; that, should the said Lovejoys lease or sell any part of the lands, they were to pay the respondent one-half the profits of such sales or leases; that, if minerals were developed, they were to pay respondent one-half the profits they realized therefrom; that the respondent reserved the right to cut wood from the lands for her personal use during her life; it provided for the payment of taxes by them, and for a forfeiture with a right of re-entry for their failure to pay any monthly installment or to pay half the profits on leases or sales or development of minerals within 30 days after due and request for payment and for the taking out of life insurance by respondent to secure the Lovejoys against loss of improvements in the event of respondent's death; and stipulated that respondent was not to be responsible for any expense of improvements so made.

The respondent's contention is that the contract creates a leasehold only, and, having been made more than 20 years ago, encounters the prohibition of the Alabama statute against leasehold estates in excess of 20 years and is now void; that period having elapsed since its execution. The Alabama statute (Code 1907, § 3418) provides

that no leasehold estate in lands can be created for a longer term than 20 years. It seems clear that this statute applies only to tenancies for terms of years, and is not appropriate to or a restriction upon tenancies for the life of the tenant or another. It also seems clear that the statute applies only to such leasehold estates as by the terms of the lease must endure longer than 20 years, and has no application to those which may or may not endure that long, depending upon the happening of a future contingency. Prout v. Webb, 87 Ala. 593, 6 South. 190; Adams v. Adams, 26 Ala. 279; Brigham v. Carlisle, 78 Ala. 244, 56 Am. Rep. 28; Heflin v. Milton, 69 Ala. 356; Derrick v. Brown, 66 Ala. 165.

The respondent's further contention is that the complainant is a tenant of respondent by virtue of her lease to the Lovejoys under whom it claims and is estopped to question the title of its landlord. Conceding that this principle could in any case apply to a tenant for life or the life of another (tenancies which are not governed by the rules relating to the relation of landlord and tenant in the same sense as are tenancies for terms of years), it is clear it cannot prevent a tenant or those in privity with him from seeking a construction of the lease under which he holds and a determination of his rights and duties under it as against his landlord. This is not questioning the title of his landlord, but recognizing it, and claiming under it the rights he asserts, and asks the court to adjudicate in his favor. The title which the tenant is estopped to dispute is that by which the landlord acquired and owns the lands leased to the tenant.

The conclusion of the court is that, if the complainant had subsisting rights in the lands in controversy, they have not expired by reason of the Alabama statute relied upon, and the complainant at the time of the filing of the bill was not estopped from asserting them and asking the court to adjudicate them in this proceeding.

The further question for decision is as to what are the respective rights of the parties under the contract. This depends upon the construction of the contract, and this is to be arrived at from the intention of the parties to it, as gathered from the language of the contract as an entirety and from the situation of the parties, rather than the technical meaning of isolated words in it. The respondent was the owner of a life estate only, in lands best adapted to farming and largely unimproved. She was unable, both financially and physically, to improve and utilize them herself, and yet her life estate in them would be valueless except by presently using them. In this situation, she and the Lovejoys traded. The duration of the life estate being uncertain, it was natural that the consideration to be paid her by the Lovejoys for the use of the land should be payable in monthly or quarterly installments during her lifetime, and that she should secure the Lovejoys in the improvements to be placed on the land by them and which would be lost to them upon her death, by insuring her life for their benefit, at their expense. The annual value of the land for farming would be reasonably stable over an extended period, and could be easily fixed for the whole life estate, at the making of the contract. On the other hand, the added value of the property, due to future mineral development or arising from

increased value and diversified uses, such as subdivision into lots, etc., was so indeterminate as not to be readily fixed at the time of the making of the contract. To cover such contingencies, the contract provided that, in the event of mineral development by the Lovejoys or sales or leases of part of the land by them, the respondent should be entitled to one-half their profits arising from the mineral development, subleases, or resales, and, to secure such division of profits, the contract provided for its forfeiture in the event of a failure on the part of the Lovejoys to make them good to respondent. It also reserved in the respondent the right to enter and cut wood from the lands for her personal use. Though the words "grant, bargain, sell, and convey all her right, title, and interest in the said lands" are broad enough, standing alone, to convey the entire life estate of the respondent unincumbered to the Lovejoys, yet, taken in connection with the subsequent reservation of the enumerated rights to respondent, it is clear the intention was otherwise. This is equally true whether the contract be construed to be a lease or a grant. In either event, by its express terms, it left rights in the lessor or grantor capable of definition and enforcement.

The form of decree suggested by complainant concedes that the installments of purchase money or rent would remain charges on any parts of the land sold by the Lovejoys, in hands of their purchasers, but contends that all other reserved rights of respondent would cease to be charges on such parts of the land as were so sold, and that respondent could only look to the Lovejoys personally for their enforcement. This contention is based on the idea that the respondent, by the terms of the contract, conferred on the Lovejoys the right to sell or lease her interest in such parts of the land, as well as their own, and that, when so sold or leased, they would be freed from obligation to respond to her reserved rights. I do not so construe the contract, nor do I find in it any language conferring on the Lovejoys any such power. The contract only provides, in the event the Lovejoys sold portions of the land instead of continuing to use them, and made a profit thereby, that half of that profit should inure to respondent. While the language of the contract is "lease or sell any part of the lands," it is clear that this cannot mean the entire interest in the lands, for the respondent only owned and only conveyed to the Lovejoys a life estate, and this life estate was the utmost that they could convey to others. In view of this, the use of the words "sale" and "lands" is without significance. It is clear that it is an interest in the lands, and not the lands themselves, that these words in the contract refer to. It must be, therefore, either the interest of the Lovejoys or that of the respondent. As express language would be necessary to authorize the selling of respondent's interest by the Lovejoys, and such language is absent from the contract, the inference is irresistible that the lease or sale referred to is of the Lovejoys' interest, and not that of respondent. If the sale or lease was of the Lovejoys' interest only, it would be subject to all of the respondent's reserved rights, set out in the contract. The concession that the purchaser from the Lovejoys would take subject to the lien

for installments of rent or purchase money admits the correctness of this conclusion, since all the rights stand on the same footing in the contract. The contract provides that respondent can elect to forfeit as well for unpaid profits of mineral development or of sales or leases as for unpaid purchase money or rent. The right given the respondent to forfeit for such unpaid profits is persuasive that her right to such profits was secured by the interest in the lands even after it had passed into the hands of a subpurchaser or sublessee, and not merely by the personal responsibility of the Lovejoys. Otherwise, the Lovejoys could, by reselling respondent's interest with their own for a nominal consideration, entirely defeat the collection of both purchase money and profits unless they were solvent and able to respond personally to respondent's claim. It is not conceivable that respondent would have made such a contract.

A fairer interpretation is that the Lovejoys could sell only their own interest in the land, and that all sales made by them were subject to respondent's interest, of which subpurchasers were notified by the contract. The profit of the Lovejoys would be the amount received from the subvendee, since the original purchase money would still be 'a charge upon the land in the hands of the subvendee, and so the Lovejoys would be released from further liability for it, or at least their liability would be postponed. One-half of this profit would go to respondent as the share in the increment of the value of the land, to which the contract entitled her. She would also be entitled to continued purchase-money installments under the contract from the subpurchaser, secured by a charge upon the land. The reserved share of profits from mineral developments, if any, are in the same category. The subpurchaser took subject to respondent's reserved mineral interest. If profits from minerals were made before or after sale by the Lovejoys, one-half of them belonged to defendant, and the payment thereof was secured by the forfeiture clause, just as were the original purchase-money or rent installments. It is true the contract uses the words "one-half the profits we realize from said minerals so developed"; but "we," fairly construed, refers both to the Lovejoys and their subvendees or sublessees. The Lovejoys, by selling the parts of the lands containing minerals before development by them for a nominal consideration, could entirely defeat respondent's reserved right to one-half of the profits from mineral development, if the construction were otherwise. This could not have been within the contemplation of the parties.

For the use of the land by the Lovejoys the contract gave respondent a fixed annual sum during her life. The provision which gave her one-half of Lovejoys' profits from resales, subleases, and mineral development was for the purpose of enabling her to share in any increased value of the lands from contingent future causes arising during her life estate. This was equitable in view of the fact that she was, aside from this provision, paid by the Lovejoys only for the use of her interest in the lands and on a valuation assessed at the beginning of the term but payable monthly during the whole of the term, instead of by a presently paid lump consideration or one based

upon a valuation increasing with the course of time during her life. Complainant's contention goes upon the idea that the half profits were to compensate respondent for relinquishing her reserved rights in the lands, sold by the Lovejoys. The "profits" for one-half of which the Lovejoys were to account to respondent were their profits on mineral development, resales, and subleases. In no just sense can amounts paid to compensate respondent for relinquishing her reserved rights be held to be profits of the Lovejoys. In no just sense can respondent, by receiving compensation for her own property rights, be said to be sharing in the Lovejoys' profits. Her right to such profits arose upon an entirely different theory, viz., the desire to permit her to share with the Lovejoys in any increment in the value of the lands during the life estate.

The right to take wood from the lands for respondent's own use during her life, while not mentioned in the forfeiture clause, is a reserved right which affects the lands, after resale or sublease, in the hands of the subvendees or sublessees.

That this construction of the contract is a correct one is borne out by the subsequent correspondence between respondent and J. H. Lovejoy, which is made part of the evidence by the stipulation, if legal evidence. It relates to negotiations between the original parties to the contract, based upon its proper construction, and so tends to show the practical construction put upon it by the original parties to the contract, before the sale to complainant's grantor. Lovejoy's letter of October 13, 1898, clearly recognizes an interest in the respondent, not only separate from his, but which would remain in her, after he had sold his, and which he was without power to sell or convey, and that a sale by him, in which the respondent did not join, would leave outstanding in her an interest in the lands subject to future disposition by her. This interest, so recognized, could be none other than the rights reserved by her and enumerated in the original contract, since she has never and does not now claim any other interest in them.

For these reasons, it seems to me that the sale of the lands by Lovejoy to Hassinger (through whom complainant claims) did not free the lands from their obligation to respond to the enumerated reserved rights of respondent, and that the respondent has a claim on them for purchase-money installments as they accrue and as well for one-half of any profits derived from the development of minerals by the complainant or its grantees, and the right to take wood therefrom during her lifetime, and also the right to take one-half the profits of the resale, secured possibly by the right to forfeit and re-enter for nonpayment thereof. This, however, is not of consequence, since it is admitted that the complainant has offered and is ready to pay to respondent the entire amount received by Lovejoy from Hassinger for his interest, which would be at least as much as the respondent's share in the profits of the resale. It is clear that Lovejoy had the right to sell his interest for such sum as he deemed proper, with the qualification that he acted in good faith and not in collusion with the purchaser and for the purpose of defeating the re-

spondent's just expectation of the profit to which the contract en-titled her; and there is no allegation or proof to the contrary in the record.

Complainant is entitled to a decree confirming its title to an estate for the life of the respondent in the lands described in the bill of complaint, subject to the lien of the respondent to secure all accruing and accrued but unpaid monthly installments due under the contract, and to her right to one-half of the profits of any development of minerals in the said lands, and to cut wood for her own use during her lifetime from the said lands in controversy, as well as one-half of the profits of the sale by Lovejoy to Hassinger. In view of the fact that the decree awards the respondent an interest in the land and each party is benefited by the determination of their respective rights in it by the decree, the costs are taxed in equal parts against each party to the bill.